UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GERRY MOBLEY, JR.,            :     CIVIL NO: 1:13-CV-01804
                             :
            Plaintiff        :
                             :     (Judge Caldwell)
        v.                   :
                             :     (Magistrate Judge Schwab)
C.O. LANTZ, *et al.*,        :
                             :
            Defendants       :
                             :

## REPORT AND RECOMMENDATION

**I. Introduction.**

        The plaintiff, Gerry Mobley, Jr., contends that one of the defendants violated

his rights by harassing him and that the other defendants violated his rights by

retaliating against him and in connection with grievance and disciplinary

proceedings.   For the reasons set forth below, we recommend that the defendants'

motion to dismiss the complaint be granted in part and denied in part.

**II. Background and Procedural History.**

        Mobley, a state prisoner proceeding *pro se*, commenced this 42 U.S.C.

§ 1983 case by filing a complaint and an application for leave to proceed *in forma*

*pauperis.*  Although Mobley is currently incarcerated at the State Correctional

Institution at Green, he is complaining about events that happened at the State

Correctional Institution at Huntingdon (SCI-Huntingdon).  Mobley names as

defendants the following officers and officials of SCI-Huntingdon and the

Pennsylvania Department of Corrections (DOC): (1) Corrections Officer Lantz;

(2) Lieutenant Morrison; (3) Captain Harman; (4) Grievance Coordinator Green;

(5) Hearing Examiner Mitchell; (6) Superintendent Bickell; (7) Chief Grievance

Officer Varner;  (8) Chief Hearing Examiner Lewis; (9) Secretary Wetzel;

(10) John/Jane Doe #1; and (11) John/Jane Doe #2.  Mobley alleges the following

facts in his complaint.

### A.  The First Interaction Between Mobley and Defendant Lantz.

On a late night in February of 2012, defendant Lantz, who was doing

security rounds, stopped at Mobley's cell and watched as Mobley was urinating.

*Doc. 1* at ¶14.  Feeling uncomfortable, Mobley stopped urinating, turned his back

to Lantz, and then finished urinating. *Id.* at ¶15.  Mobley noticed Lantz looking at

his I.D. number and photograph hanging on the outside of his cell gate. *Id.* at ¶16.

Lantz then asked Mobley if he was at SCI-Huntingdon before, and Mobley

responded that he was not. *Id.* at ¶¶18 & 22.  Lantz next asked Mobley if he had a

brother or cousin who maxed out in 2006 or 2007, and Lantz said that there was a

prior inmate at SCI-Huntingdon with the same last name, who looked a lot like

Mobley, and who got into a dispute with an officer. *Id.* at ¶23.  Mobley responded

2

that he didn't have any family at SCI-Huntingdon and that he doesn't even have any brothers or sisters. *Id.* at ¶24.  Lantz proceeded to ask Mobley why he had turned his back, and Mobley responded that he was urinating and that he did not want a man watching him urinate. *Id.* at ¶¶25 & 26.  Lantz then asked Mobley if he was trying to hide something or flush something because he had seen him coming. *Id.* at ¶27.  Mobley denied that and said that he was just urinating. *Id.* at ¶28. Defendant Lantz then said: "Oh you're just shy." *Id.* at ¶29.  Mobley responded that he did not want a man watching him urinate. *Id.* at ¶30.  Lantz then again asked Mobley if he had a brother, said that there were three or four inmates with the last name of Mobley at SCI-Huntingdon, and he asked if Mobley was related to any of them. *Id.* at ¶¶31 & 33.  Mobley said no and repeated that he does not have any siblings. *Id.* at ¶¶32 & 34.  Lantz then left to finish his rounds. *Id.* at ¶35.

Mobley's responses to Lantz about not having any siblings or any family members that were incarcerated at SCI-Huntingdon were lies. *Id.* at ¶¶19 & 21-22. In fact, Mobley has a brother, Jermal Mobley, who was previously imprisoned at SCI-Huntingdon. *Id.* at ¶19.  According to Mobley, he lied to Lantz, and others, about his brother because Jermal had problems with some of the guards at SCI-Huntingdon. *Id.* at ¶21.  In fact, Jermal had been seriously assaulted by another prisoner when guards handcuffed him and threw him into a cell with another inmate, who beat him until he was unconscious. *Id.* at ¶19.  Jermal was also beaten

by several guards at SCI-Huntingdon. *Id.* Mobley alleges that he feared the same problems would befall him if he told staff that he was Jermal's brother. *Id.* at ¶21.

After Lantz left to finish his rounds, Mobley's cellmate—"Trigger"—told Mobley to watch out for Lantz, who Trigger described as an asshole and a racist and who, according to Trigger, the administration and staff knew would start a war between the guards and inmates. *Id.* at ¶36. When Mobley told Trigger that Lantz had been watching him urinate, Trigger told Mobley that Lantz was "trying to bird watch," that many inmates had reported Lantz "for harassing them on gay shit," and that Lantz lied and got them put in the hole. *Id.* at ¶39. Trigger repeated his warning to Mobley to watch out for Lantz. *Id.*

**B.  Defendant Lantz's Interaction with Mobley the Next Night.**

The next night, at about 11:00 p.m., Mobley, who was known by guards and inmates as "the Candy Maker," was sitting at his desk making homemade candy, which he sold, traded, and shared with other inmates. *Id.* at ¶¶41 & 42. Lantz stopped at Mobley's cell, and, in what Mobley describes as a mocking and mischievous tone, stated: "My buddy Mobley, what are your doing." *Id.* at ¶43. Mobley simply responded that he was making his candy. *Id.* at ¶44. Lantz again questioned Mobley about whether he had a brother at SCI-Huntingdon, and Mobley again lied that he did not. *Id.* at ¶¶45-47. Feeling uneasy, Mobley put the

lids on his candy bowls, turned off his light, washed his hands, and climbed on his bed. *Id.* at ¶¶48-50.  Noticing Lantz still standing and watching him, Mobley asked: "What's up man?" *Id.* at ¶50.  Lantz told Mobley that he was keeping an eye on him, and Mobley again asked what's up. *Id.* at ¶¶51-52.  Lantz then said: "You know what's up with me." *Id.* at ¶53.  After Mobley responded that he did not know, in an intimidating tone, Lantz told Mobley that he "better find out" and that he would see him later. *Id.* at ¶55.

After Lantz left, Mobley again spoke to Trigger, who repeated that Lantz is trouble, that inmates had reported him for doing gay stuff, and that he had a million and one grievances filed against him because of the stuff that he was into. *Id.* at ¶¶57 & 58.  Mobley asked what kind of stuff, and Trigger responded that Lantz is on the graveyard shift because inmates keep having problems with him. *Id.* at ¶¶59 & 60.  Thinking that Trigger was just playing with his emotions and joking, Mobley got a cup of water, took his blood pressure medications, and got in bed. *Id.* at ¶61.

Less than two hours later, Mobley woke up to urinate. *Id.* at ¶62.  While he was urinating, Lantz again stopped at his cell. *Id.*  Lantz shined his flashlight on Mobley, who finished urinating, and Lantz just stood there. *Id.* at ¶63.  Mobley asked him why he was standing there, and in an aggressive tone, Lantz said: "You're a fucking liar.  Ghondi's your brother!" *Id.* at ¶64.  (Ghondi is Jermal

Mobley's nickname.) *Id.* at ¶65.  Mobley stuck to his lie and said that he doesn't

have any brothers or sisters. *Id.* at ¶66.  Lantz again accused Mobley of lying, and

Mobley, who was irritated, told Lantz to stop shining the flashlight in his face. *Id.*

at ¶¶67 & 68.  Lantz responded by telling Mobley not to give him orders and by

threatening to put Mobley in the hole. *Id.* at ¶69.   After Mobley apologized and

said that he did not want any trouble, Lantz stated: "Oh you want some trouble.

You sitting there lying to me." *Id.* at ¶¶70 & 71.  Lantz then called Mobley a

"motherfucker" and said he knew that he is related to Ghondi because he looked in

the database. *Id.* at ¶73.   Mobley told Lantz that he did not lie and that, in any

event, it was none of his business, and Mobley asked Lantz why he keeps

bothering him. *Id.* at ¶74.  Lantz told Mobley in a threatening voice that, since

Ghondi is his brother, he had three strikes against him. *Id.* at ¶75.   After Mobley

said that he does not want any trouble and that he will stay out of Lantz's way,

Lantz walked away. *Id.* at ¶¶76 & 77.   Trigger then told Mobley that he had

warned him that Lantz was a nut. *Id.* at ¶78.

Less than 30 minutes later, at approximately 3:00 a.m., Lantz woke Mobley,

told Mobley to get off his bed, and said that he wanted Mobley's feet on the floor.

*Id.* at ¶¶80-82.  When Mobley protested, Lantz stated: "I'm giving you a direct

order to get off of your bunk.  You got about 3 seconds if you're not off that bed,

I'm gonna send you to the hole and say you fucked up my count." *Id.* at ¶¶85 & 86. Struck with fear and anxiety, Mobley complied. *Id.* at ¶87.

Lantz then told Mobley, who was in his undershirt and boxer shorts, that he needed to see some flesh. *Id.* at ¶¶87 & 88. After Mobley asked what he had said, Lantz repeated that he needed to see some flesh. *Id.* at ¶¶89 & 90. Mobley again protested, and Lantz ordered him to come to the gate. *Id.* at ¶¶91 & 92. When Mobley complied, Lantz again said "show me some flesh," and he shined his flashlight on plaintiff's t-shirt, boxer shorts, and legs. *Id.* at ¶92. Lantz then shined the flashlight at Mobley's crotch, which prompted Mobley to respond: "Man you crazy!" *Id.* at ¶93. Lantz then told Mobley to show him his hands and to hold them out. *Id.* at ¶94. Mobley held his hands out as if he was being searched. *Id.* Lantz then told Mobley to lift his shirt up, but Mobley did not do so and told Lantz that he was "tripping." *Id.* at ¶¶94 & 95. Lantz then told Mobley to run his hands around the band of his underwear, and although he protested, Mobley complied. *Id.* at ¶¶96 & 97. Lantz responded by saying: "If I tell you I need to see flesh, that's what I mean, don't give me no lip. You give me lip and I'll throw your ass in the hole. Now get over the shyness, and the next time I say show me some flesh that's what I mean. Flesh!" *Id.* at ¶98. When Mobley pointed out that it was not policy to stand up and show flesh, Lantz told Mobley that if they have to go through this again, he will write him up saying that Mobley messed up his count. *Id.* at ¶99 &

7

100.  After Lantz left, Mobley told Trigger that he was going to report Lantz, and Trigger warned Mobley that Lantz was "down with" defendant Morrison and Lieutenant Johnson and that they would put him in the hole. *Id.* at ¶¶103 & 104.

### C.  The Third Night.

The next night, Lantz again woke Mobley and ordered him off his bed. *Id.* at ¶¶106 & 110.  Mobley protested, asked Lantz why he was harassing him, and pointed out that Lantz was not doing this to anybody else. *Id.* at ¶110.  Lantz threatened to send Mobley to the hole if he did not comply, and he ordered Mobley to come to the cell gate. *Id.* at ¶¶111-113.  In what Mobley describes as a gruff, lustful voice, Lantz, while shining his flashlight on Mobley's t-shirt stated: "Show me some flesh, I know you don't want to go to the hole." *Id.* at ¶113.  Mobley protested, causing Trigger to sit up in his bed, at which point Lantz said: "Blockcard, I told you I was counting[.]  [Y]ou fuck[ed] up my count.  If I gotta tell you one more time, you're going to the hole." *Id.* at ¶114.

After Lantz walked away, because of anxiety, anger, and fear, Mobley was light headed, his heart was pounding, and his chest was hurting, and he took his blood pressure medication and drank cup of water. *Id.* at ¶115.  Trigger then told Mobley that he had to report Lantz, and Mobley responded that he thought Lantz was singling him out because of his brother. *Id.* at ¶117.  Trigger then told Mobley

8

the he remembered his brother and that ten guards had jumped on him. *Id.* at ¶118. Mobley was unable to sleep because of Lantz's harassment and threats to place him in the hole and because he feared that Lantz was trying to sexually assault him. *Id.* at ¶120.

The next day, Mobley learned from other inmates that Lantz had a vendetta against his brother and had constantly threatened and harassed him. *Id.* at ¶¶121 122. He also learned that defendant Morrison treated his brother cruelly, put him in the hole, and orchestrated the assault on his brother. *Id.* at ¶122. Given this information, Mobley was worried that Lantz was targeting him because of his brother and that something bad would happen to him. *Id.* at ¶123.

### D. February 23, 2012.

In the early morning hours of February 23, 2012, Lantz again woke Mobley and shined his flashlight in Mobley's eyes. *Id.* at ¶¶124 & 125. Although he was gripped by fear, Mobley tried to ignore Lantz. *Id.* at ¶¶125-127. That did not work, and Lantz ordered Mobley off his bed and threatened to put him in the hole if he did not comply. *Id.* at ¶¶128-130. Mobley, who was in his t-shirt and boxer shorts, complied and stepped to the cell gate, where Lantz shined his flashlight on Mobley's stomach and crotch. *Id.* at ¶¶131 & 132. Mobley alleges that Lantz, in a voice filled with lust, said: "Let me see some flesh." *Id.* at ¶132. Mobley protested

and said that he was not gay. *Id.* at ¶133.  Lantz then threatened to put Mobley in

the hole, told him to lift his shirt up, and asked "what's under there?" *Id.* at ¶134.

Mobley lifted his shirt and said there was nothing under his shirt. *Id.* at ¶135.  As if

strip searching him, Lantz ordered Mobley to run his hands around the band of his

boxer shorts, and although humiliated, embarrassed, angry, and fearful, Mobley

complied. *Id.* at ¶136.  According to Mobley, Lantz then ordered him to stretch his

boxers out, to which Mobley responded "Man you crazy!" *Id.* at ¶137.  Lantz then

said, "I gotta see some flesh," and he shined his flashlight directly on the crotch of

Mobley's boxer shorts. *Id.* at ¶138.  He again told Mobley to show some flesh, he

asked what was in Mobley's shorts, he told Mobley to stop being shy, and he

threatened to put Mobley in the hole. *Id.* at ¶138.  Mobley told Lantz there was

nothing in his shorts, and Mobley pulled the waistband of his underwear. *Id.* at

¶139.  At that point, Lantz flashed the light on Mobley's penis, and Mobley

quickly let the band of his underwear go so that Lantz could not see any more. *Id.*

Lantz then told Mobley to "turn around and show me the back!" *Id.* at ¶140.

Feeling violated, Mobley refused, turned on the light to cell, and got loud,

which caused Trigger to sit up on his bed. *Id.* at ¶141.  Lantz's demeanor then

changed, and as if he was simply giving an order regarding count, he stated: "I'm

required to see flesh, I walk past here and I can't see you on the bed moving, I

have to make sure you're breathing." *Id.* at ¶143.  Mobley told Lantz that he was

going to report him for sexual harassment. *Id.* at ¶144.  Lantz threatened to put Mobley in the hole for interfering with his count. *Id.* at ¶¶145-147.

After Lantz walked away, Mobley, who was visibly shaken and afraid that Lantz was going to continue the harassment, told Trigger that he was going to report Lantz, and he asked Trigger if he would back his complaint. *Id.* at ¶148. Trigger told Mobley to do what he must do, and he said that, if questioned, he would tell what he saw and heard. *Id.* at ¶149.  Mobley was having chest pains, so he took his blood pressure medication and tried to go to sleep. *Id.* at ¶150.

Less than two hours later, Lantz was back at Mobley's cell calling his name. *Id.* at ¶151.  Thinking that he was going to the hole, Mobley jumped up. *Id.* at ¶152.  Lantz then stated: "Listen, I don't want no shit out of you.  We had a problem with your brother.  In like 20 more minutes, I'm gonna open this tier and your cell.  Do whatever you have to do, because you have to go and sit on center at 5:00 a.m.  They're taking you on a hospital run.  You have to get some tests done on your heart.  So get ready. I don't want no shit!"  *Id.* at ¶152.  Mobley thought that Lantz was setting him up to assault him, to rape him, or to sexually harass him, and he told Lantz to just call the hole now and that he was reporting him. *Id.* at ¶153.  Lantz walked off. *Id.* at ¶154.

Ten minutes later, another corrections officer came to Mobley's cell and told him he was going to open the tier because Mobley had to go on a hospital run. *Id.*

11

at ¶154. Thinking that Lantz was using this corrections officer to set him up, Mobley pleaded with the officer not to set him up for Lantz. *Id.* at ¶¶155 & 156. The officer had no idea what Mobley was talking about, and he told Mobley that Lantz was a "fucking asshole" and "trouble," that he was not getting involved, and that Mobley did, in fact, have a hospital run. *Id.* at ¶157.

Mobley got dressed, and around 5:00 a.m., his cell gate was opened. *Id.* at ¶158. Lantz was nowhere in sight, but defendant Harman was standing at the top of the block. *Id.* at ¶158. When Mobley started to speak, Harman, in a military-like tone, told him to just have a seat on center. *Id.* at ¶159. Mobley sensed trouble, and he thought that Harman was expecting him to say something about Lantz, who was still nowhere in sight. *Id.* at ¶160. Mobley followed Harman's order, and he was stripped searched and taken to a local hospital for a nuclear stress test on his heart. *Id.* at ¶161 & 162.

After he returned from the hospital, Mobley returned to his cell and tried to get some rest, but he was too stressed out and worried that Lantz was going to continue harassing him. *Id.* at ¶163. So Mobley pulled out his handbook, found the policy on counts, and confirmed what he already knew from his 17 years in prison, *i.e.,* that the 6:00 a.m., Noon, 4:00 p.m., and 9:00 p.m. counts were standing counts, which required inmates to have their feet on the floor, but the 1:00 a.m. count was a silent count, which did not require inmates to have their feet on the

floor. *Id.* at ¶¶164 & 165.  Mobley also found in his handbook the section on sexual harassment. *Id.* at ¶164.  Although the handbook provided that there was zero tolerance for sexual misconduct, Mobley feared reporting Lantz for fear of retaliation or not being believed. *Id.* at ¶¶166& 167.

### E.  Mobley's Report to the Sexual Assault Hotline, His Request Slip, and Grievance No. 400607.

According to Mobley, despite his fear, in the evening of February 24, 2012, he activated the anonymous Sexual Assault Hotline and reported Lantz's harassment. *Id.* at ¶168.  Mobley alleges that initially the recording hung up on him, so he called back and his complaint was recorded. *Id.* at ¶169.  After two days with no intervention, Mobley feared that his complaint was being ignored. *Id.* at ¶170.  So, on February 27, 2012, after he still had not received a response to his Sexual-Assault-Hotline complaint, Mobley submitted an Inmate Request to Staff form and a grievance to defendant Green. *Doc. 1-2* at 2-3.

In his request slip, Mobley reported that Lantz kept coming to his cell late at night or early in the morning, shining his flashlight in his face, making him get off the bed, and forcing him to expose his flesh, meaning his private areas. *Id.* at 2.  Mobley stated that Lantz did that as recently as February 23-24[th], and he stated that on February 24th , he reported Lantz on the Sexual Assault Hotline, but no one responded. *Id.*  Mobley stated that he feared something will happen to him. *Id.*

Mobley's grievance is similar to his request slip. *Id.* at 3.  In his grievance (No. 400607) he stated that on February 24th he called the Sexual Assault Hotline about Lantz. *Id.*  He stated that, on February 23, 2012, Lantz came to his cell, flashed his flashlight in his face while he was asleep, told him to remove the sheets from his body, and told him that he wanted to see some flesh. *Id.*  Mobley stated in the grievance that Lantz did the same thing every time that he had worked during the last week or so. *Id.*  Mobley further stated that Lantz threatened him with a write-up if he did not remove the sheets from his body, said show me some flesh, and then said you are getting a block card for interfering with count. *Id.*  Mobley stated that either Lantz had homosexual tendencies and this was sexual harassment or Lantz was harassing him because of his brother. *Id.*

Defendant Harman responded to Grievance No. 400607 as follows:

> I have investigated your grievance.  You claim that Officer Lantz woke you out of your sleep while conducting count by flashing a flashlight in your face.  You also make statements that CO Lantz is sexually harassing you and that he must be a homosexual.
>
> Inmate Mobley, the inmate handbook specifically states that "when the signal is given for a count, you must immediately stand by your cell door or bunk, with the light on, so you are clearly visible to the officer taking the count.  You must remain silent during count.  If it is necessary to take a recount, you must go through the same procedure.  When count is completed, you will be notified by an announcement.  Counts taken after evening lockup will be silent counts and, except for you being visible to staff, the above does not apply."  This can be found in Section VIII, subsection C, #14, of the inmate handbook.  Officer Lantz is well within his duties to require

you to uncover your head, if you are not visible to the Officer. He is required to see you during count as the inmate handbook clearly states. Officer Lantz is in fact required to see flesh and movement while conducting count. Just because you are issued sheets and a blanket does not give you the right to completely cover your face and body so as the officer conducting rounds and count cannot see you. By Officer Lantz requiring you to un-cover so that he can see flesh and movement does not constitute sexual harassment. For you to make statements as written in your grievance referencing Officer Lantz as a homosexual can however be considered sexual harassment and using abusive language to an employee. I personally walked around with Officer Lantz during the 0300 count on February 28, 2012 and he had to wake 2 different inmates during this count because he was un-able to see flesh and movement. This further proves that you are not being singled out and harassed as you claim. **Based on the result of my investigation, your grievance is denied.**

*Doc. 1-2* at 4 (emphasis in original).

Mobley appealed the denial of his grievance to defendant Bickell, who found the grievance without merit. *Doc. 1-2* at 4. Mobley then appealed the denial of grievance 402607 to defendant Varner, who, according to Mobley, in an attempt to interfere with his access to the court, ignored his appeal. *Id.* at ¶249. Mobley contends that this was done in conspiracy with Bickell, Harman, Morrison, and Lantz to discredit his claims in the event he filed a lawsuit. *Id.* On May 28, 2013, Mobley sought redress from defendant Wetzel, but to no avail. *Id.* at ¶255.

15

**F.  Misconduct Proceedings.**

Two days after he filed his grievance with defendant Green, Mobley

received a misconduct report from defendant Morrison charging him with lying to

an employee. *Doc. 1-3* at 2.  The misconduct report stated, in pertinent part:

> The Security Office received a copy of a Grievance dated
> February 27, 2012 authored by inmate Mobley on February 29,
> 2012.  Inmate Mobley begins his Grievance by stating he called
> the Sexual Assault Hotline and reported his complaint on
> February 24, 2012 at 7:30 p.m.
> The Security Office had not received such a complaint
> from SCI Camp Hill, which is standard procedure, and inquired
> of SCI Camp Hill concerning the matter.  Shift Lt. McElwain,
> SCI Camp Hill, reviewed the calls placed to the Sexual Assault
> Hotline on February 24, 2012.  Lt. McElwain reports there were
> no phone calls received from any inmate or inmate's family
> from SCI Huntingdon on February 24, 2012.
> Inmate Mobley is blatantly lying that he called the Sexual
> Assault Hotline to report his complaint.

*Id.*  Mobley alleges that he did, in fact, call the Sexual Assault Hotline, and he

contends that Morrison issued the misconduct in retaliation for his grievance. *Doc.*

*1* at ¶¶185 & 186.  According to Mobley, in the afternoon of February 29, 2012, he

again called the Sexual Assault Hotline this time to report the retaliation, but

Sergeant Younker told him to get off the phone because it was count time. *Id.* at

¶186.

Mobley alleges that in response to the misconduct report he claimed that the

report was issued in retaliation and he requested that the following individuals be

called as witnesses at his disciplinary hearing for the following reasons: (1) Ms.

Deihl, the telephone coordinator, to prove that he dialed the Sexual Assault
Hotline, (2) defendant Morrison to prove that the misconduct was issued in
retaliation, and (3) defendant Green to prove that Morrison did not investigate his
grievance and to prove retaliation. *Id.* at ¶196.  Mobley alleges that at his
disciplinary hearing, on March 2, 2012, defendant Mitchell looked at Mobley's
inmate version of the events, at a copy of his grievance, and at the misconduct
report, and he asked Mobley how he pleaded. *Id.* at ¶¶198-200.  Mobley pleaded
not guilty and asserted that the charge was false and was issued in retaliation. *Id.* at
¶200.  According to Mobley, Mitchell then yelled: "90 days, if you don't like it file
a lawsuit or a grievance.  Get him out of my face!" *Id.* at ¶201.  Mobley told
Mitchell to call his witnesses. *Id.* at ¶202.  Mitchell again stated: "90 days file a
lawsuit of a grievance.  Get him out of here!" *Id.* at ¶203.  After Mobley accused
Mitchell of retaliating against him, Mitchell again stated: "Get him out of here!"
*Id.* at ¶¶204 & 205.  Mobley was then removed from the hearing room and escorted
to the Restricted Housing Unit (RHU). *Id.* at ¶206.

Later that same day, while in the RHU, Mobley received a copy of
Mitchell's written decision, in which Mitchell stated that he believed the staff
report over Mobley. *Id.* at ¶¶207 & 208.  Mitchell found that Mobley had not
called the Sexual Assault Hotline as Mobley had claimed in his grievance. *Id.* at
¶208.  He based that conclusion on two premises: (1) all calls to the Sexual Assault

17

Hotline are recorded, and (2) Officer McElwain at SCI-Camp Hill had indicated to defendant Morrison that there were no calls from SCI-Huntingdon on the hotline at the relevant time. *Id.* Mitchell also noted that calls to the Sexual Assault Hotline are not documented on the inmate's phone record, but for anonymity reasons, are only documented at SCI-Camp Hill on the Sexual Assault Hotline phone record. *Id.* While noting that inmates cannot be charged with misconduct for legitimate use of the grievance system, Mitchell concluded that charges may be filed where, as here, the inmate lied in the grievance. *Id.* at ¶209. Mitchell sanctioned Mobley with 90 days disciplinary custody time. *Id.*

Mobley alleges that Morrison and Mitchell knew that he did not lie about Lantz harassing him, and he asserts that they conspired to retaliate against him and to falsify that Morrison actually talked to McElwain, when the record was devoid of evidence that Morrison talked to McElwain. *Id.* at ¶214. In fact, according to Mobley, Morrison never talked to McElwain. *Id.* at ¶226.

Mobley appealed the disciplinary finding to the Program Review Committee (PRC) claiming that he was retaliated against and that he was denied a fair hearing. *Id.* at ¶216. The PRC denied his misconduct appeal, but it reduced the sanction from 90 days disciplinary time to 60 days. *Doc. 1-3* at 5. Mobley further appealed to Bickell, who reviewed Mobley's contentions but rejected his appeal as lacking

18

merit. *Id.* at 7.  Mobley further appealed his disciplinary sanctions to defendant Lewis, who, on April 13, 2012, denied his appeal. *Doc. 1-3* at 10.

### G.  Request to Ms. Deihl.

In the meantime, on March 3, 2012, Mobley filed an inmate request to Ms. Deihl, SCI-Huntingdon's telephone coordinator, asking her to confirm the dates and times of his outgoing calls to the Sexual Assault Hotline. *Doc. 1-4* at 2.  A couple of days later, Deihl responded that that information is confidential and she does not have access to it, and she set forth the procedures to use the hotline. *Id.* Not satisfied with Ms. Deihl's response, Mobley asked for the information again, but again Deihl stated that she could not provide the information and that Mobley will need to contact security. *Id.* at 3.  Thereafter, on March 9, 2012, Mobley submitted a request to defendant Bickell asking for a printout of outgoing calls from the phone he used to contact the Sexual Assault Hotline. *Id.* at 4.  At the request of Bickell, defendant Green responded that the information is confidential and will not be released. *Id.*

### H.  Grievance No. 404181.

On March 12, 2012, Mobley filed another grievance (No. 404181) alleging that he was being hampered from successfully appealing his misconduct sentence because he was not provided with a list of outgoing phone calls from the phone he

used to call the Sexual Assault Hotline. *Doc. 1-5* at 3. He also contended that the misconduct report was falsified and that he was retaliated against for reporting defendant Lantz. *Id.* Defendant Green rejected that grievance on the basis that issues regarding inmate discipline and misconduct procedures must be handled through DC-ADM 801. *Id.* at 2. Defendant Bickell upheld that rejection. *Id.* at 5.

Mobley then appealed to defendant Varner, who dismissed the appeal on the basis that Mobley did not provide the required documentation for proper review. *Id.* at 5. Mobley alleges that Varner falsely stated that he did not provide the required documents and, as was her custom and practice, did not explain what documents were missing. *Doc. 1* at ¶248. According to Mobley, Varner makes it a continuous practice and custom to unlawfully reject prisoner's grievances alleging that they did not submit the proper documents without telling them what documents they have failed to submit. *Id.* at ¶250.

On April 25, 2012 or April 26, 2012, defendant Morrison threatened Mobley that he would bury him in the hole, if he attempted to litigate the sexual harassment or retaliation claims in court or if the matter ever came up again. *Id.* at ¶253. Mobley, who was very ill with respiratory and cardiac problems, feared that he would not get needed medical care and that Morrison would continue his retaliation. *Id.* at ¶254

20

The complaint contains 11 Counts.  Count One is a claim against defendant Lantz for sexual harassment/harassment.  Count Two is a Fourth Amendment claim against defendant Lantz for unlawful search.  Count Three is a First Amendment retaliation claim against defendant Morrison based on the misconduct report Morrison issued.  Count Four is an Eighth Amendment claim against defendants Bickell, Harman, and Morrison for failing to intervene when they learned of defendant Lantz's actions.  Count Five is an Equal Protection claim against defendant Lantz for singling Mobley out because of his brother and against defendants Bickell, Harman, and Morrison for acquiescing in Lantz's conduct. Count Six is a due process claim against defendant Mitchell based on the disciplinary proceedings and against defendants Bickell and Lewis for failing to correct Mitchell's actions.  Count Seven is a conspiracy claim under 42 U.S.C. § 1983 against defendants Morrison, Mitchell, Bickell, Harman, Lewis, Varner, Wetzel, and Green for conspiring with Lantz to retaliate against Mobley.  Count Eight is an Eighth Amendment failure-to-train and failure-to-supervise claim against defendants Bickell and Harman for failing to properly train defendant Lantz.  Count Nine is an Eighth Amendment failure-to-screen and failure-to-train claim against defendant Wetzel and the John/Jane Does for failing to properly screen and train defendants Varner, Lewis, Bickell, Lantz, Morrison, Harman, and Green.  Count Ten is an Intentional Infliction of Emotional Distress claim against

defendants Lantz, Morrison, Bickell, and Harman.  And Count Eleven is a

defamation claim against defendants Morrison, Bickell, Mitchell, and Lewis.

Mobley is seeking declaratory and injunctive relief as well as compensatory and

punitive damages.

 The defendants filed a motion to dismiss the complaint and a brief in support

of that motion.  Mobley filed a brief in opposition.  The motion to dismiss is ripe,

and for the reasons discussed below, we recommend that it be granted in part and

denied in part.


## III. Discussion.

### A.  Motion to Dismiss and Pleading Standards.

 In accordance with Fed.R.Civ.P. 12(b)(6), the court may dismiss a complaint

for "failure to state a claim upon which relief can be granted."  When reviewing a

motion to dismiss, "[w]e must accept all factual allegations in the complaint as

true, construe the complaint in the light favorable to the plaintiff, and ultimately

determine whether plaintiff may be entitled to relief under any reasonable reading

of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In

making that determination, we "consider only the complaint, exhibits attached to

the complaint, matters of public record, as well as undisputedly authentic

documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769-70 (M.D. Pa. 2012).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009).  The statement required by Rule 8(a)(2) must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Detailed factual allegations are not required, but more is required than labels, conclusions, and a formulaic recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "A complaint has to "show" such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court must accept as true all well-pleaded factual allegations in the complaint, and all reasonable inferences that can be drawn from the complaint are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.,* 20 F.3d 1250, 1261 (3d Cir. 1994).  A court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902,

906 (3d Cir. 1997).  Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions.  Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation.  In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'  Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010)(quoting *Iqbal,* 556 U.S. at 675 & 679).

A complaint filed by a *pro se* litigant is to be liberally construed and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson,* 551 U.S. at 94 (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)).  Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).  Thus, a well-pleaded complaint must

contain more than mere legal labels and conclusions.  Rather, a *pro se* complaint

must recite factual allegations that are sufficient to raise the plaintiff's claimed

right to relief beyond the level of mere speculation, set forth in a "short and plain"

statement of a cause of action.

### B.  The Complaint Fails to State an Eighth Amendment Claim Against Defendant Lantz Upon Which Relief Can Be Granted.

In Count One of the complaint, Mobley claims that defendant Lantz violated

the Eighth Amendment by harassing him.  We conclude that the complaint fails to

state an Eighth Amendment claim upon which relief can be granted against

defendant Lantz.

The Eighth Amendment prohibits cruel and unusual punishment of a

prisoner. U.S. Const. Amend. VIII.  "[S]exual abuse of a prisoner by a correctional

officer serves no legitimate penological purpose," *Jones v. Luzerne Cnty. Corr.*

*Facility*, 3:10-CV-0359, 2010 WL 3338835, at *8 (M.D. Pa. Aug. 23, 2010), and

may in "some circumstances" violate the Eighth Amendment, *Boddie v. Schnieder*,

105 F.3d 857, 860 (2d Cir. 1997).  "For a prisoner to prevail on a sexual

harassment Eighth Amendment claim, he must show that the alleged punishment

was "objectively, sufficiently serious," and that the officer involved had a

"sufficiently culpable state of mind." *Sharpe v. Costello*, 1:06-CV-1493, 2007 WL

1098964, at *4 (M.D. Pa. Apr. 11, 2007)(quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).

But mere "verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment." *Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006). "Even in the context of sexual harassment directed at an inmate by a prison guard, words, without more, are not enough to state a claim for a violation of the Eighth Amendment." *Kirk v. Roan*, 1:04 CV 1990, 2006 WL 2645154, at *4 (M.D. Pa. Sept. 14, 2006). Although verbal sexual harassment is unprofessional and unsavory, it does not rise to the level of an Eighth Amendment violation. *Id.* And courts have held that "sexual harassment in the absence of contact or touching" does not violate the Eighth Amendment. *Manon v. Garrison*, 1:CV-12-0844, 2012 WL 3542328, at *2 (M.D. Pa. Aug. 15, 2012); *see also Robinson,* 204 F.App'x at 156 (holding that prisoner who alleged that officer made racial comments, sexual advances, and sexual comments failed to state an Eighth Amendment claim upon which relief can be granted); *Howard v. Everett,* 208 F.3d 218 (table), 2000 WL 268493, at *1 (8th Cir.2000)("[S]exual harassment, absent contact or touching, does not constitute unnecessary and wanton infliction of pain"); *Baylor v. Pennsylvania Dep't of Corr.*, 1:CV-12-0341, 2013 WL 5177573, at *3 (M.D. Pa. Sept. 13, 2013)(citing cases supporting the proposition that mere verbal harassment does not violate the Eighth Amendment and holding that

prisoner failed to state an Eighth Amendment claim based on allegations that two officers used racial and profane language toward him and two other officers asked him to perform sexual acts for them).

Here, Mobley does not allege that defendant Lantz touched him.  Rather, Mobley's allegations amount to verbal harassment.  As such, the complaint fails to state an Eighth Amendment claim against defendant Lantz upon which relief can be granted.

### C.  The Complaint Fails to State an Eighth Amendment Claim Against Defendants Bickell, Harman, and Morrison.

In Count Four of the complaint, Mobley claims that defendants Bickell, Harman, and Morrison violated the Eighth Amendment by failing to intervene when they learned of defendant Lantz's actions.  "For there to be a failure to intervene, it follows that 'there must exist an underlying constitutional violation.'" *Santiago v. Fields,* No. 05–4884, 2009 WL 693642, at *4 (E.D.Pa. Mar.12, 2009) (quoting *Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir.2005)).  Because the complaint fails to state an Eighth Amendment claim against defendant Lantz based on the verbal harassment, it follows that it fails to state an Eighth Amendment claim against defendants Bickell, Harman, and Morrison for failing to intervene to stop that harassment.

### D.  The Complaint States a Fourth Amendment Claim Against Defendant Lantz Upon Which Relief Can Be Granted.

In Count Two of the complaint, Mobley claims that defendant Lantz violated the Fourth Amendment by forcing him to expose his stomach by lifting his shirt and by forcing him to expose his penis by opening his boxer shorts.  Mobley contends that there were no penological reasons for such actions.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  "The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" *Delaware v. Prouse,* 440 U.S. 648, 653-54 (1979)(footnote omitted)(quoting *Marshall v. Barlow's Inc.,* 436 U.S. 307 (1978)).  "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  Rather, a court must balance the "need for the particular search against the invasion of personal rights that the search entails." *Id.* In doing so, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

28

In the correctional setting, "officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1517 (2012). Because "[t]he task of determining whether a policy is reasonably related to legitimate security interests is 'peculiarly within the province and professional expertise of corrections officials,' unless there is '"substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters.'" *Id.* (quoting *Bell,* 441 U.S. at 548 and *Block v. Rutherford*, 468 U.S. 576, 584 (1984)).

Defendant Lantz argues that Mobley does not have a Fourth Amendment right to be free of strip searches, and absent an allegation of abusive touching, his claim must be dismissed. In support of his two-sentence argument, Lantz cites *Watson v. Sec'y Pennsylvania Dep't of Corr.*, 436 F. App'x 131 (3d Cir. 2011). In that case, however, the Third Circuit reversed the dismissal of the Fourth Amendment claim based on strip searches because the district court "did not examine the circumstances surrounding the various searches in the light most favorable to [the plaintiff], who emphasized that not all searches were merely visual and who described purposeful sexual denigration during some inspections." *Id.* Although prison officials may have legitimate penological interests in

29

conducting routine strip searches, here, as alleged by Mobley, the searches were not routine and were not done for legitimate penological interests.  At this stage of the proceedings, we must take Mobley's allegations as true and construe them in his favor.  Doing so, we conclude that the complaint states a Fourth Amendment claim against defendant Lantz upon which relief can be granted.  While it may later be shown the Lantz's actions were reasonable, in which case he cannot be liable under the Fourth Amendment, such a determination must await a more developed factual record.

### E.  The Complaint States a Retaliation Claim Against Defendant Morrison Upon Which Relief Can Be Granted.

In Count Three of the complaint, Mobley claims that defendant Morrison retaliated against him for filing a grievance against defendant Lantz.  He contends that Morrison retaliated by issuing him a false misconduct report.

Retaliation claims are judged against exacting legal standards.  A prisoner claiming that a defendant retaliated against him for exercising his constitutional rights must show that: (1) his conduct was constitutionally protected; (2) he suffered "adverse action" at the hands of the defendant; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision of the defendant. *Carter v. McGrady,* 292 F.3d 152, 158 (3d Cir. 2002).

Defendant Morrison contends that Mobley cannot prove a causal link between the grievance and the misconduct report because the grievance was against defendant Lantz but Morrison issued the misconduct report.  It may be more difficult for a prisoner to prove a retaliation claim against an officer who was not the subject of a prior grievance than it is to prove a retaliation claim against an officer who was the subject of a prior grievance.  But, contrary to defendant Morrison's suggestion, a retaliation claim is not necessarily limited to those officers against whom the prisoner previously filed grievances. *Real v. Dunkle,* CIV.A. 3:11-2071, 2012 WL 1392334, at *7 (M.D. Pa. Apr. 23, 2012).  The issue is whether Mobley's grievance was a substantial or motivating factor in the decision of defendant Morrison to issue the misconduct report.  Because Morrison issued the misconduct report a mere two days after Mobley filed his grievance and because Morrison specifically referred to Mobley's grievance in the misconduct report, there is no basis, at this stage of the proceedings, for the Court to conclude that Mobley's grievance was not a substantial or motivating factor in Morrison's decision to issue the misconduct report.

"[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate

31

penological interest." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001).  In *Carter*

*v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002), the United States Court of Appeals

for the Third Circuit affirmed the grant of summary judgment to prison officials on

claims that the officials took disciplinary actions against the prisoner for his legal

activities.  In *Carter,* based on the "sizeable quantum" of evidence of misconduct

on the part of the prisoner, the court concluded that, even if the prison officials

were motivated by animus to jailhouse lawyers, the prisoner's offenses "were so

clear and overt" such that there was no genuine issue of material fact that the

officials' actions were reasonably related to legitimate penological interests and the

prisoner "would have been disciplined notwithstanding his jailhouse lawyering."

*Id.* at 158-59.  The court described the "sizeable quantum" of evidence of

misconduct against the prisoner:

> In this case, Carter was never charged with misconduct
> for helping other inmates with legal matters or having their
> legal materials in his cell.  Rather, he was charged with
> misconduct for undisputed violations of prison policy.  The
> search and seizure of items from his cell were related to these
> various violations.  Carter was discovered with a stolen
> typewriter in his cell.  The cell search uncovered an envelope
> containing two receipts for the typewriter, identical to the sales
> receipt and credit card sales slip faxed by the vendor.  As a
> result, Carter was disciplined with sixty days in the RHU.
> Moreover, it is not disputed that Carter corresponded
> with Unger in violation of prison policy.  Carter conceded that
> he wrote a note to Unger without seeking authorization for that
> correspondence.  His cell was searched in connection with this
> allegation; he was written up and subsequently disciplined with
> thirty days for this conduct.  Additionally, there is no dispute

that the amount of property kept by Richard Carter and Dana
Carter in their cell exceeded the amount allowed by fire and
safety regulations.  The materials were seized for this reason,
and Carter was allowed to select up to two boxes of his
personal material to keep in his cell.  Finally, in the course of
searching Carter's cell in connection with the unauthorized use
of the mails, prison officials found the newsletter, "The Last
Line of Defense," a publication of which Carter was the editor
and for which he had not requested or obtained approval by the
SCI–Mahanoy administration.  The foregoing represents a
sizeable quantum of misconduct evidence.

*Id*. at 158.

Morrison cites unpublished decisions, including the Third Circuit's opinion

in *Nifas v. Beard,* 374 F.App'x 241 (3d Cir. 2010), for the proposition that

retaliatory-disciplinary claims fail when there is some evidence supporting a guilty

finding on the misconduct charge.  In *Nifas,* the Third Circuit held that "Nifas's

retaliatory discipline claim fails because there is 'some evidence' supporting the

guilty findings for the three disciplinary charges brought against Nifas after he

filed his grievance in October 2006." *Id.* at 244.  In *Nifas,* the Third Circuit cited

the Eighth Circuit's decision in *Henderson v. Baird,* 29 F.3d 464, 469 (8th Cir.

1994), which held that a finding based on "some evidence" that the prisoner

committed the misconduct charged essentially "checkmates" a prisoner's

retaliation claim.

We are bound by the Third Circuit's published opinions, not its unpublished

opinions.  Thus, we must follow *Carter* rather than *Nifas.*  "[I]n *Carter,* the

controlling precedential case in this circuit, the Court of Appeals granted summary

judgment for the defense based on the "quantum of evidence" in the record

concerning the plaintiff's misconduct, not the mere fact that the prisoner had been

found guilty of the misconduct." *Mincy v. McConnell*, 1:09-CV-236-SJM-SPB,

2012 WL 1436562, at *2 (W.D. Pa. Apr. 25, 2012)(quoting *Carter,* 292 F.3d at

152). "*Carter* should not be read as establishing a per se bar against retaliation

claims in every instance where a prisoner is found guilty of an allegedly false

misconduct charge." *Id.*[1]

---

[1] We note that the "some evidence" standard is borrowed from a due process case. *See Superintendent v. Hill*, 472 U.S. 445, 455 (1985)(holding that due process requires that there be some evidence to support the findings of the disciplinary hearing officer). In other contexts, the Third Circuit has distinguished due process claims from retaliation claims based on conduct protected by the First Amendment. *Allah v. Seiverling*, 229 F.3d 220, 224 (3d Cir. 2000)(holding that *Sandin v. Conner,* 515 U.S. 472 (1995), does not preclude a claim that the prisoner was kept in administrative segregation in retaliation for filing civil rights actions against prison officials because retaliation may be actionable even when the retaliatory action does not involve a liberty interest); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)("We hold that the relevant question is not whether Rauser had a protected liberty interest in the privileges he was denied, but whether he was denied those privileges in retaliation for exercising a constitutional right."); *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002)(noting, in the context of a claim by a prisoner that an officer issued a false misconduct report in retaliation for the prisoner's conduct toward the officer and to cover up a beating, that it had "previously held that falsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment guarantee of access to the courts," but concluding that Smith did not "claim that another constitutional right (such as access to the courts) was violated" and therefore his due process claim based on the falsified misconduct failed).

Here, Morrison charged Mobley with lying to an employee based on his statement that he called the Sexual Assault Hotline, but Mobley alleges that he did, in fact, call the Sexual Assault Hotline.  It would be premature at this early stage of the proceedings to find that defendant Morrison should prevail on the retaliation claim on the basis that he would have issued the misconduct report even in the absence of Mobley's protected conduct for reasons reasonably related to legitimate penological interests.  As the Third Circuit has observed, its "precedential cases dealing with the burden-shifting analysis generally arise from orders granting summary judgment, not orders dismissing complaints for failure to state a claim." *Watson v. Sec'y Pennsylvania Dep't of Corr.*, 436 F. App'x 131, 135 (3d Cir. 2011)(stating further that "[t]o find that the defendants have, at this stage of the litigation, 'rebutted' Watson's prima facie claim would be to subject the veracity of his allegations to premature judicial testing, at odds with our obligation to assume the truth of his factual proffer").  Thus, we conclude, that the retaliation claim against defendant Morrison should not be dismissed on the basis that Mobley was found guilty of the misconduct alleged in the misconduct report.

**F.  The Equal Protection Claim Against Defendants Bickell, Harman, and Morrison Should Be Dismissed, But the Equal Protection Claim Against Defendant Lantz Should Not Be Dismissed.**

In Count Five, Mobley claims that defendants Lantz, Bickell, Harman, and Morrison violated his right to equal protection because defendant Lantz singled him out because of his brother and because defendants Bickell, Harman, and Morrison acquiesced in Lantz's conduct.

The Equal Protection Clause of the Fourteenth Amendment directs that all similarly situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).  Two independent legal theories exist upon which a plaintiff may predicate an equal protection claim: the traditional theory and the class-of-one theory.  The traditional theory protects a plaintiff from discriminatory treatment based on membership in a protected class such as race. *See, e.g., id.; McLaughlin v. Florida,* 379 U.S. 184, 192 (1964).  To assert a protected-class claim, the plaintiff must show that (1) he or she is a member of a protected class and (2) the government treated similarly situated individuals outside of the protected class differently. *See Oliveira v. Twp. of Irvington,* 41 F. App'x 555, 559 (3d Cir. 2005) (observing that a prima facie case under the Equal Protection Clause requires plaintiffs to prove membership in "a protected class and that they received different treatment than that received by other similarly-situated individuals").  Under this theory a plaintiff "must prove the existence of purposeful

36

discrimination" by the defendants. *Keenan v. City of Phila.,* 983 F.2d 459, 465 (3d Cir. 1992).

Under the class-of-one theory, a plaintiff may advance an equal protection claim absent membership in a protected class if the plaintiff shows that the defendants engaged in irrational and intentional differential treatment of him when compared with similarly situated individuals. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). This theory allows a plaintiff to assert an equal protection claim regardless of protected class when the government irrationally treats the plaintiff differently from similarly situated individuals. *Id.* at 564; *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006). To state a class-of-one claim, the plaintiff must show that: (1) the defendants treated him differently from others similarly situated; (2) the defendants did so intentionally; and, (3) there was no rational basis for the difference in treatment. *Hill,* 455 F.3d at 239.

Defendants Bickell, Harman, and Morrison contend that the complaint fails to state an equal protection claim against them upon which relief can be granted because Mobley has not alleged facts satisfying the elements of a traditional equal protection claim. We agree that Mobley does not successfully state a traditional equal protection claim as he has not alleged that he is a member of a protected class. We conclude, however, that Mobley is attempting to state a class-of-one equal protection claim. Defendants Bickell, Harman, and Morrison suggest,

nevertheless, that the complaint fails to successfully state such a claim against

them because they were not personally involved in the underlying conduct.

Liability under Section 1983 "'cannot be predicated solely on the operation

of respondeat superior.'" *Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir. 2005)

(quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1998)). Thus, a

constitutional deprivation cannot be premised merely on the fact that the defendant

was a prison supervisor when the incidents set forth in the complaint occurred. *See*

*Alexander v. Forr*, 297 F. App'x 102, 104-05 (3d Cir. 2008). "Because vicarious

liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has

violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). There are

two viable theories of supervisory liability. *Santiago v. Warminster Twp.*, 129

F.3d, 121, 129 n.5 (3d Cir. 2010). Under the first theory, a supervisor can be liable

if he or she established and maintained a policy, practice, or custom that directly

caused the constitutional harm. *Id.* Under the second theory, a supervisor can be

liable if he or she participated in violating the plaintiff's rights, directed others to

violate the plaintiff's rights, or as the person in charge had knowledge of and

acquiesced in his or her subordinates' violations of the plaintiff's rights. *Id.*[2]

---

[2] Numerous courts have expressed uncertainty as to the continued viability and
scope of supervisory liability following *Iqbal*. *Santiago,* 629 F.3d at 130 n.8 (citing
cases). But since *Iqbal* did not clearly overrule Third Circuit law on supervisory

In this case, Mobley does not allege that defendants Bickell, Harman, and Morrison participated in singling him out for harassment. Nor does he allege that they directed defendant Lantz to do so. He also does not allege that at the time of defendant Lantz's harassment, Bickell, Harman, and Morrison had knowledge of Lantz's actions and acquiesced in those actions. Although Mobley asserts that he informed Bickell, Harman, and Morrison of Lantz's harassment, he does not allege that he did so while the harassment was ongoing. Rather, Mobley alleges that he later informed Bickell, Harman, and Morrison. But such after-the-fact knowledge is insufficient to establish personal involvement on the part of Bickell, Harman, and Morrison.

Moreover, liability in this case may not be based on the fact that Bickell failed to act favorably upon administrative appeals lodged by Mobley. Indeed, in the context of appeals of prisoner grievances, it is well settled that a supervisor may not be held liable for civil rights violations based solely upon a failure to grant an inmate's appeal of an adverse decision. *Pressley v. Beard,* 266 F. App'x 216, 218 (3d Cir. 2008). Indeed, as to such claims, the United States Court of Appeals for the Third Circuit has held that summary dismissal is appropriate "because there is no apparent obligation for prison officials to investigate prison grievances."

---

liability, we are bound to follow that law unless or until the Third Circuit rules otherwise.

*Paluch v. Sec'y Pennsylvania Dept. Corr.,* 442 F. App'x 690, 695 (3d Cir. 2011). This principle applies with equal force to claims leveled against prison supervisors who deny appeals from disciplinary decisions. *See Hayes v. Walsh,* 3:11–CV–01739, 2012 WL 2462316 at *4 (M.D.Pa. June 27, 2012) (Caputo, J.)("[S]upervisory review and/or ratification of disciplinary misconduct determinations generally do not establish the supervisor's personal involvement in the deprivation of an inmate's constitutional rights."). Therefore, defendant Bickell cannot be liable merely because he reviewed and affirmed the hearing examiner's and grievance officer's decisions.

We conclude that the complaint fails to state an equal protection claim upon which relief can be granted against defendants Bickell, Harman, and Morrison. The complaint also raises an equal protection claim against defendant Lantz. Defendant Lantz, however, has not moved to dismiss the equal protection claim against him, and so that claim will go forward.[3]

---

[3] It appears that defense counsel construed the complaint as attempting to state an equal protection claim against only Bickell, Harman, and Morrison. But construing the complaint liberally, we conclude that it also contains an equal protection claim against Lantz.

40

## G. The Complaint Fails to State a Due Process Claim Upon Which Relief Can Be Granted.

In Count Six, Mobley claims that defendant Mitchell denied him due process in connection with his disciplinary hearing and that defendants Bickell and Lewis also denied him due process by failing to correct Mitchell's actions.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." .U.S. Const. Amend. XIV.  A due process claim requires a two-part analysis.  First, the court must determine whether the interest asserted by the plaintiff is within the scope of protection of life, liberty, or property found in the Due Process Clause. *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000).  Second, if the interest is one that is protected by the Due Process Clause, "the question then becomes what process is due to protect it." *Id.*

In *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court, addressing the question of when the state can create liberty interests protected by the Due Process Clause, held that:

> States may under certain circumstances create liberty interests which are protected by the Due Process Clause.  But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant

41

> hardship on the inmate in relation to the ordinary incidents of
> prison life.

*Id*. at 483-84.  In *Sandin*, the inmate was sentenced to thirty days of disciplinary

confinement in the Special Holding Unit.  As a result of the inmate's disciplinary

segregation he "had to spend his entire time alone in his cell (with the exception of

50 minutes each day on average for brief exercise and shower periods, during

which he nonetheless remained isolated from other inmates and was constrained by

leg irons and waist chains)." *Id*. at 494 (Breyer, J. dissenting).  The Court

concluded that the inmate's thirty days in the Special Holding Unit, considered

within the context of prison confinement, did not impose the type of atypical and

significant deprivation of liberty in which the state could be seen to have created a

liberty interest. *Id.* at 486.  The Court noted that disciplinary confinement at the

prison in question, with only insignificant exceptions, mirrored conditions imposed

on inmates in administrative and protective custody; that based on a comparison of

inmates inside of and outside of disciplinary segregation, placement in segregation

for thirty days did not work a major disruption in the inmate's environment; that

disciplinary action did not inevitably affect the duration of the inmate's sentence;

and that the "regime to which [the inmate] was subjected was within the range of

confinement to be normally expected for one serving an indeterminate term of 30

years to life." *Id*. at 486-87.

"After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)(quoting *Sandin,* 515 U.S. at 484).  In deciding whether a protected liberty interest exists under *Sandin*, we consider the duration of the confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn,* 318 F.3d 523, 532 (3d Cir. 2003).  Whether a protected liberty interest exists under *Sandin* requires inquiry into the specific facts of the case. *Id.* at 533.  But "inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest." *Burns v. Pennsylvania Dept. of Corrections,* 642 F.3d 163, 171 (3d Cir. 2011).

In this case, Mobley alleges that he was given 90 days (later reduced to 60 days) disciplinary-custody time.  That amount of time in disciplinary custody by itself, however, does not amount to an atypical and significant hardship thus creating a liberty interest protected by the Due Process Clause. *See Smith v. Mensinger,* 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven months of disciplinary confinement not an atypical and significant hardship).

43

Mobley alleges that he suffered an atypical and significant hardship as a result of the disciplinary finding because he was not returned to his victim's awareness group, his violence prevention group, or his kitchen job. *Doc.1* at ¶215. But those are normal consequences of a disciplinary sentence, and Mobley has not alleged facts from which it can reasonably be inferred that he was subjected to an atypical and significant hardship in relation to the ordinary incidents of prison life based on the conditions under which he was held.  Accordingly, the complaint fails to state a due process claim against defendants Mitchell, Bickell, and Lewis upon which relief can be granted.

### H.  The Complaint Fails to State a Conspiracy Claim Upon Which Relief Can Be Granted.

In Count Seven of the complaint, Mobley claims that defendants Morrison, Mitchell, Bickell, Harman, Lewis, Varner, Wetzel, Green, and Lantz conspired to retaliate against him.  We conclude that the complaint fails to state a conspiracy claim upon which relief can be granted.

"The essence of a conspiracy is an agreement." *United States v. Kelly,* 892 F.2d 255, 258 (3d Cir. 1989).  "To demonstrate the existence of a conspiracy under § 1983, 'a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right under color of law.'" *LeBlanc v. Stedman*, 483 F. App'x 666, 670 (3d Cir. 2012)(quoting *Parkway Garage, Inc. v.*

*City of Phila.,* 5 F.3d 685, 700 (3d Cir.1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392 (3d Cir. 2003)). "It is not enough that the end result of the parties' independent conduct caused the plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Perez v. Gamez*, 1:13-CV-1552, 2013 WL 6073877, at *9 (M.D. Pa. Nov. 18, 2013). Rather, the plaintiff must show that the defendants acted in concert with the specific intent to violate the plaintiff's rights. *Davis v. Fox*, 3:12-CV-1660, 2013 WL 5656125, at * 5 (M.D. Pa. Oct. 15, 2013). Further, a "conspiracy claim only arises when there has been an actual deprivation of a right." *Perano v. Twp. of Tilden,* 423 F. App'x 234, 239 (3d Cir. 2011).

Here, although Mobley alleges that the defendants conspired to retaliate against him, he has not pleaded facts to support such a conspiracy claim. He has not alleged facts from which it can reasonably be inferred that the defendants reached an agreement to deprive him of his constitutional rights. "To properly plead such an agreement, 'a bare assertion of conspiracy will not suffice.'" *Great Western Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 178 (3d Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Because Mobley has not alleged facts from which it can reasonably be inferred that defendants Morrison, Mitchell, Bickell, Harman, Lewis, Varner, Wetzel, Green,

and Lantz reached an agreement to violate his rights, the complaint fails to state a

conspiracy claim upon which relief can be granted.

**I.  The Complaint Fails to State Failure-to-Train and Failure-to-Supervise Claims Against Defendants Bickell and Harman Upon Which Relief Can Be Granted.**

In Count Eight, Mobley contends that defendants Bickell and Harman

violated the Eighth Amendment by failing to train and by failing to properly

supervise defendant Lantz.

In addition to being conclusory, Mobley's allegations that defendants

Bickell and Harman failed to properly train and to properly supervise Lantz fail

because, as discussed above, Lantz's verbal harassment did not violate Mobley's

Eighth Amendment rights.  Therefore, any failure to train on the part of defendants

Bickell and Harman in this regard also fails. *See Crawford v. Lappin,* 446 F.App'x

413, 416 (3d Cir. 2011)(stating that "the absence of an underlying constitutional

violation precludes any supervisory liability on a "knowledge or acquiescence" or

"failure to train" theory"); *Tri Thanh Nguyen v. Franklin Cnty.*, 3:10-CV-1866,

2012 WL 1378679 (M.D. Pa. Apr. 20, 2012)("Since there was no unconstitutional

conduct, supervisory liability also fails on a policy or practice approach."), *aff'd ,*

12-2559, 2013 WL 323249 (3d Cir. Jan. 29, 2013).

**J.  The Complaint Fails to State a Claim Upon Which Relief Can Be Granted Against Defendant Wetzel and the Doe Defendants.**

In Count Nine, Mobley claims that defendant Wetzel and John and Jane Doe defendants violated the Eighth Amendment by failing to screen and by failing to train defendants Varner, Lewis, Bickell, Lantz, Morrison, Harman, and Green.  We conclude that the complaint fails to state a claim upon which relief can be granted against defendants Wetzel and the Doe defendants.

First, as discussed above, the complaint fails to state a claim upon which relief can be granted against defendants Varner, Lewis, Bickell, Harman, and Green.  Thus, the failure-to-train and failure-to-screen claims against defendant Wetzel and the Doe defendants as to the training and screening of those defendants fail.

Second,  Mobley has failed to allege facts reasonably supporting a failure-to-train claim or a failure-to-supervise claim against defendant Wetzel and the Doe defendants as to the training and screening of defendants Lantz and Morrison.  To hold a supervisor liable because his or her policies or practices led to a constitutional violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and must allege facts from which it can reasonably be inferred that: (1) the existing policy or practice created an unreasonable risk of constitutional injury; (2) the supervisor was aware of that risk; (3) the supervisor was deliberately indifferent to that risk; and (4) constitutional injury resulted from

47

the policy or practice. *Beers–Capitol v. Whetzel,* 256 F.3d 120, 134 (3d Cir. 2001).

"[O]ne way—perhaps the easiest way—a plaintiff can make out a supervisor

liability claim is by showing that 'the supervisory official failed to respond

appropriately in the face of an awareness of a pattern of such injuries.'" *Id.*

(quoting *Sample v. Diecks,* 885 F.2d 1099, 1118 (1989)).  Usually, "an

unreasonable risk in a supervisory liability case will be shown by evidence that

such harm has in fact occurred on numerous occasions." *Sample,* 885 F.2d at 1118.

"But that is not the only way to make out such a claim, as 'there are situations in

which the risk of constitutionally cognizable harm is so great and so obvious that

the risk and the failure of supervisory officials to respond will alone support

findings of the existence of an unreasonable risk, of knowledge of that

unreasonable risk, and of indifference to it.'" *Beers–Capitol,* 256 F.3d at 134

(quoting *Sample,* 885 F.2d at 1118).  It is not enough, however, for a plaintiff to

allege that his constitutional rights would not have been violated if the supervisory

defendant had done more than he or she did. *Sample,* 885 F.2d at 1118.  Instead,

the plaintiff must specifically identify what the defendant failed to do that

evidences his or her deliberate indifference. *Id.*  "Only in the context of a specific

defalcation on the part of the supervisory official can the court assess whether the

official's conduct evidenced deliberate indifference and whether there is a close

causal relationship between the 'identified deficiency' and the 'ultimate injury.'"
*Id.*

While Mobley alleges, upon information and belief, that defendant Wetzel knew that Lantz was racist, discriminatory, oppressive, and a sexual predator, *doc. 1* at ¶256, Mobley has not alleged facts supporting an inference that Wetzel knew such before Lantz harassed him or while Lantz was harassing him.  Rather, Mobley merely alleges that in May of 2013, he complained to Wetzel of the actions taken against him.  Such after-the-fact knowledge is not sufficient to support a claim against Wetzel upon which relief can be granted.  Moreover, Mobley has not alleged facts reasonably supporting an inference that either defendant Wetzel or the Doe defendants were aware that an existing policy or practice at SCI-Huntingdon created an unreasonable risk of constitutional injury.  Accordingly, the complaint fails to state a claim against Wetzel and the Doe defendants[4] upon which relief can be granted.

---

[4]  The Doe defendants have not been identified or served with the complaint.  Thus, they have not moved to dismiss the claims against them.  But we may consider the claims against them *sua sponte* under 28 U.S.C. § 1915A.

**K. The State Law claims Against Defendants Bickell, Harman, Mitchell, and Lewis Should Be Dismissed, but the State Law Claims Against Defendants Lantz and Morrision Should Not Be Dismissed at this Stage of the Proceedings.**

Count Ten of the complaint is an Intentional Infliction of Emotional Distress claim against defendants Lantz, Morrison, Bickell, and Harman, and Count Eleven is a defamation claim against defendants Morrison, Bickell, Mitchell, and Lewis. The defendants contend that these state law claims are barred by sovereign immunity.

Sovereign immunity bars claims against the Commonwealth, its agencies, and its employees acting within the scope of their duties. *See* 1 Pa. Const. Stat. Ann. § 2310.  But Pennsylvania law waives sovereign immunity in nine limited circumstances.  These exceptions to the general grant of immunity to the Commonwealth and its employees are for negligent acts involving: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa.C.S.A. § 8522(b).  "Under Pennsylvania's sovereign immunity statute, 'an employee of the Commonwealth . . . acting within the scope of his or her employment or duties, is protected by sovereign immunity from the imposition of liability for intentional tort claims.'" *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672,

682 (M.D. Pa. 2010)(quoting *Holt v. NW. Pennsylvania Training P'ship*

*Consortium, Inc.,* 694 A.2d 1134, 1139 (Pa.Cmmwlth.Ct. 1997)).  '"[W]illful

misconduct does not vitiate a Commonwealth employee's immunity if the

employee is acting within the scope of his employment, including intentional acts

which cause emotional distress.'" *Id.* at 682 (quoting *Cooper v. Beard,* Civ. A. No.

06–171, 2006 WL 3208783, at *16 (E.D.Pa. Nov. 2, 2006)).  The exceptions to the

Commonwealth's sovereign immunity must be strictly construed because the

legislature waived immunity only in specific situations. *Moser v. Heistand,* 681

A.2d 1322, 1326 (Pa. 1996).

The defendants argue that because Mobley's state tort claims do not fall

within any of the nine limited exceptions to sovereign immunity, they are immune

under the doctrine.  We agree that Mobley's state law claims are not included

among § 8522's exceptions to sovereign immunity.  Thus, if the defendants were

acting within the scope of their employment, they are entitled to sovereign

immunity.  Mobley argues, however, that defendants Lantz and Morrison were not

acting within the scope of their employment.  Courts in this district do not presume

that "immunity is automatically warranted" in every circumstance for every

Commonwealth employee. *See Shipman v. Gelso*, No. Civ. A. 3:11-CV-1162, 2011

WL 5554252, at *5 (M.D. Pa. Nov. 15, 2011).  A court may deny a motion to

dismiss on the basis of state sovereign immunity where it is unclear from the facts

of the case whether the Commonwealth employees were actually acting within the scope of their employment. *Id.* An employee's conduct falls within the scope of his or her employment when it: "(1) is the kind that the employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits; (3) is motivated at least in part by a desire to serve the employer; and (4) if force was used by the employee against another, the use of force is not unexpectable by the employer." *Savage v. Judge*, No. Civ. A. 05-2551, 2007 WL 29283, at *5 (E.D. Pa. Jan. 2, 2006)(citing Restatement (Second) of Agency § 228).

Based on the alleged conduct of defendant Lantz—the harassment of Mobley for no penological purpose—and the alleged retaliation of defendant Morrison, we cannot say, as a matter of law, at this early stage of the proceedings that the conduct of Lantz and Morrison was consistent with the duties they were employed to perform. "Where the alleged intentional tort was unprovoked, unnecessary or unjustified by security concerns or penological goals, courts have ruled that such conduct does not, as a matter of law, fall within the scope of employment." *Wesley v. Hollis*, 2007 WL 1655483, at *15 (E.D.Pa. June 6, 2007); *see also Velykis v. Shannon*, No. Civ. A. 06-0124, 2006 WL 3098025, at *4 (M.D. Pa. Oct. 30, 2006)(holding that defendant who allegedly intentionally slammed a van door on a prisoner's head was not entitled to sovereign immunity at the motion-to-dismiss stage). Additionally, "[s]ince an employee is generally

authorized to use only 'reasonable' measures to achieve a result desired by his or her employer, an 'outrageous' act may lie beyond the scope of his or her employment even where it constitutes 'a means of accomplishing an authorized result.'" *Zion v. Nassan*, 283 F.R.D. 247, 267 (W.D.Pa. 2012)(quoting *Lunn v. Yellow Cab Co.*, 403 Pa. 231 (1961)).  In other words, "[a] high degree of 'outrageousness' can take an employee's actions 'outside the scope' of his or her employment." *Id.* (quoting *Haas v. Barto*, 829 F. Supp. 729, 734 (M.D. Pa. 1993)).

Here, Mobley contends that defendants Lantz and Morrison were not acting within the scope of their employment in connection with their actions against him. Lantz and Morrison have not addressed that argument.  At this early stage of the proceedings, and without the benefit of full briefing on the issue, we conclude that it would be premature to conclude that defendants Lantz and Morrison were acting within the scope of their employment, and, therefore, we recommend that the state law claims against Lantz and Morrison not be dismissed.

Although Mobley also asserts state law claims against defendants Bickell, Harman, Mitchell, and Lewis, he does argue that these defendants were not acting within the scope of their employment.  And as they are alleged to have merely been involved in grievance and disciplinary proceedings and appeals, there is no reasonable basis to conclude that they were not acting within the scope of their

employment.  Accordingly, we recommend that the state law claims against Bickell, Harman, Mitchell, and Lewis be dismissed.

### L  Leave to Amend.

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. County of Allegheny,* 515 F.3d 224, 245 (3d Cir. 2008).  In this case, Mobley filed an exceedingly detailed complaint.  In fact, the complaint is so detailed that it appears that Mobley has alleged every interaction he had with the defendants and every action or inaction, of which he is aware, on the part of the defendants.  Yet except as to the few claims that have survived, he has still failed to state a claim upon which relief can be granted.  Under these circumstances, granting Mobley leave to amend would be futile.

## IV.  Recommendations.

Accordingly, for the foregoing reasons, it is recommended that the defendants' motion (doc. 17) to dismiss the complaint be granted in part and denied in part.  It is recommended that all claims in the complaint be dismissed except the following: (1) the Fourth Amendment claim against defendant Lantz; (2) the retaliation claim against defendant Morrison; (3) the equal protection claim against defendant Lantz; and (4) the state law claims against defendants Lantz and

Morrison.  Finally, it is recommended that the case be remanded to the undersigned for further proceedings.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 8th day of July, 2014.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge

55